Nacoe Ray Brown
FRN 34730-037
FCI Victorville II
P.O. Box 3850
Adelanto, CA 92301



## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Nacoe Ray Brown, )
　　　Petitioner, )
 )
 )
　　　　v. )
 )
 )
United States of America, )
 )
　　　Respondents. )

CASE No. **CV17-973 - RGK (AJW)**

**MOTION TO VACATE JUDGEMENT
WRIT OF HABEAS CORPUS - ALL
WRITS ACT 28 USC Section 1651**
In Re: 1:01-cr-00377-JFM-1
Northern District of Baltimore
Maryland

COMES NOW, above named Petitioner, in pro se, in want and need of counsel, respectfully moves this Honorable Court for a consideration, adjudication and/or ruling that will allow for a review of the meritotious claims brought forth in the instant Petition/Motion.

As this Court is well aware, the Supreme Court mandates that courts liberally construe pro se pleadings and should read such pleadings, provided they state a valid claim, in less stringent standards. **Estelle v. Gamble**, 50 L.Ed. 2d 251 S. Ct. (1976); **Haines v Kerner**, 404 U.S. 519 S. Ct. (1972).

Page 1 of 10



JURISDICTION AND VENUE

The instant petition is properly before this Court as Petitioner Brown's place of confinement is in this jurisdiction, should this Honorable Court construe the instant Petition/motion pursuant to the provisions of 28 U.S.C. Section 2241.

This Court has great latitude and ample discretion to construe Petitioner's Brown Petition/Motion in a manner that a legal consideration can be made based on the merits contained herein and not impeded by a mere procedural or labeling ground.

As this Court will be able to determine, the circumstances and grounds raised in this petition satisfies the requirements of Federal Rule of Civil Procedure Rule 60(b), which allows a court to relieve a party from a final judgement in order to prevent a manifest injustice, see **Harvest v Castro**, 531 F.3d 737 (9th Cir. 2008), which as this Honorable Court will be able to determine, exists in this case.    This newly discovered evidence of fraud and/or misconduct by opposing party, is authentic newly discovered and not attained on the basis of mistake, inadvertence, surprise or excusable neglect as is required by the provisions of Rule 60(b).   The claims in this Petition also meet the requirements of Federal Rule of Civil Procedure 59(e) if treated as a Motion for Reconsideration or as a Motion to Alter or Ammend Judgement and/or to present previuosly unavailable newly discovered evidence, which is the case in this matter now before this Court.

Page 2 of 10

Additionally, the Ninth Circuit Court of Appeals has re-cognized that that common law writs such as Writ of Audita Querela are available to the extent that they fill "gaps" in the current systems of post-conviction relief.  See **United States v Valdez-Pacheco**, 237 F.3d 1077 (9th Circuit 2001) which states that Audita Querela relief is available if:

1) there is a legal objection to a conviction or sentence which has arisen subsequent to that conviction or sentence

2) the legal objection is not redressable pursuant to another post-conviction remedy.

Furthermore, this Honorable Court can prevent a manifest injustice and consider the newly discovered evidence presented in this peculiar case within the scope of 28 United States Code Section 2255 - Motion to Set Aside, Vacate or Correct a Sentence by a Federal Prisoner - as Petitioner Brown has never before had the opportunity to raise this issue through any motion and there-fore has lacked "an unobstructed procedural shot" at having these valid and meritorious claims adjudicated.  **Alaimalo v U.S.**, 645 F. 3d 1042 (9th Circuit 2011); see also **Ivy v Pontesso**, 328 F.3d 1057 (9th Circuit 2003).

Petitioner hereby submits as Exhibit "A" - evidence that he only recently (in December of 2016) received FBI records, which Petitioner has been asking for years and which supports adjudication of his claim under the miscarriage of justice exception and sufficient to overcome untimeliness or procedural default.

STATEMENT OF THE CASE

The circumstances in this case are highly unusual and have had a significant adverse impact on Petitioner Brown's Constitutional rights as well as the integrity of the judicial proceedings in the instant matter.  To compound matters, issues directly related to this case have gained national publicity and an extensive FBI investigation was initiated.

Please find, labeled as Exhibit "B", copies of published articles which have been publicly disseminated (not an exhausted list) regarding the incredible events that took place during and after Petitioner's trial in Baltimore, Maryland in 2001.

As this Honorable Court will be able to determine from the instant pleading, court records and publications, critical evidence - which the government greatly emphasized during its case-in-chief and closing arguments (over $36,000 in cash) - was inexplicably and incredibly stolen during the course of the trial by "someone" in the very United States Attorney's office that prosecuted Petitioner Brown. The money was not available for the jury to inspect, verify or corroborate during jury deliberations.

Said cash/evidence was initially found in a safe in the home of Kevin Hilliard, a convicted felon who implicated Petitioner and testified at Petitioner Brown's trial in exchange for leniency in his own (Hilliard's) prosecution.

Petitioner Brown took his case to a jury trial as he did not obtain an adequate plea bargain nor constitutionally effective legal representation in that stage of the process. Accordingly, the proper identification of the bundles/wrappings of this cash/evidence became of paramount importance to Petitioner's evidentiary and due process rights, his defense tactics as well as the trial as a whole.

Petitioner's attorney, the presiding judge, the jury and Petitioner Brown himslef were all calculatedly deceived as no one told any of them that the critical evidence/money had dissapeared, was missing/stolen. During the lengthy jury deliberations, the jury specifically asked all the evidence (money) but no money was ever submitted to the jury for verification or authentication. After long deliberations, the jury deadlocked on one of the counts but found Petitioner guilty of the remaining counts.

Petitioner found out about all this approximately two years afterwards when it became public that an extensive FBI investigation had been under way regarding the missing/stolen money/evidence in Petitioner's trial. Petitioner pleaded with his former attorney to help him bring a legal challenge to the clear violations this situation brought forth, but the attorney refused to open up this can of worms.

For the past eight (8) years Petitioner has been consistently and continually attempting to obtain this information. Please see Exhibit "C".

## THE JUDGEMENT SHOULD BE VACATED IN THIS CASE
## AND A NEW TRIAL SHOULD BE GRANTED

As demonstrated in Exhibit "A", Petitioner only recently received evidence regarding the newly discovered evidence now being brought forth in the instant petition/motion. Petitioner was transfered to FCI Victorville II on December 22, 2016 and a few days afterwards received the FBI discovery documents that Petitioner had been requesting, through the Freedom of Information Act, for many years, as shown in Exhibit "C". As such, this Petition/Motion is hereby promptly submitted in order to obtain judicial review so as to correct the fundamental errors, constitutional trespasses and/or violations this case presents.

As this Honorable Court will be able to determine, through Exhibit "D", the FBI conducted an extensive investigation into what they deemed as "valuable evidence" which was stolen before the jury was able to inspect, verify and link to Petitioner's case. This evidence/money was heavily relied upon by the prosecution during trial and at closing arguments. It was an important part of the prosecution's tactical strategy, thus an important consideration that the jury had to evaluate to reach a verdict. So crucial to the prosecutiion was this evdience/missing money that as United States Distrcit Court judge Andre M. Davis, who presided over Petitioner's trial, when interviewed by the F.B.I. - also found at Exhibit "D" - stated that:

"[T]he money was pilled high on the witness stand, almost blocking the face of the SAs who were testifying."

Of specific and significant consideration were the wrappings/packaging/markings that this stolen money contained which was entered into evidence by the government for the the very purpose of tying this money/crucial evidence to the bank robberies that Petitioner allegedly participated in. Accordingly, without being able to inspect this evidence, despite having asked for the evidence, the jury did not make an informed or reliable conclusion. How can, by any standard, this can be considered a reliable, reaonable or just process?

There is no doubt that this "valuable evidence" was a critical material fact in dispute. The United States Supreme Court has determined that a fact is "material" if proof of its existence or non-existence would affect the disposition of the case under applicable law, **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a different verdict. Id at 257.

The fact that he jury was not allowed to authenticate or otherwise test the veracity of the evidence relied on so heavily at trial but unavailable for inspection during jury deliberations violates Federal Rule of Evidence 901. The fact that the jury, the court and everyone else was deceived about the missing/stolen evidence/money violate any sense or appearance of fairness/justice.

Federal Rule of Evidence 901(a) states **In General**:
To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce sufficient to support a finding that the item is what the proponent claims it is. Please see Exhibit "E".

Under Federal Rule of Evidence 901(b) (4) evidence that satisfy the requirements of this Rule includes:

Distinctive Characteristics and the Like

The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

This is precisely why this Rule was established: to avoid the exact circumstance that happened in the instant case and precisely what the jury was prevented from accomplishing in this unusual case.

The fact that the jury not only deadlocked on one of the counts but took so long in their deliberations, lends sufficient credence that they had considerable difficulties reaching a verdict without being able to authenticate critical evidence, notwithstanding the fact that they were never told that someone from the prosecution (probably the prosecutor himself) stole the money. Had the jury been aware of such flagrant misconduct, they most certainly would have acquitted the defendant in this matter as this impermissible trespass would have decimated the prosecution's case against Petitioner and would have nullified any credibilty of the prosecution.

The Chief United States District Court judge, the Hon. Alexander Harvey II, as well as the judge who presided the trial in this case, the Hon. Andre M. Davis, noted in their FBI interview/investigation the length of the jury deliberations as well as the number of questions:

> "HARVEY advised that judge DAVIS found it sur-
> prising that the case had gone to the jury,
> and he (DAVIS) was also surprised at the level
> and number of questions coming from the jury.
> Judge DAVIS did not under stand why there were
> so many questions from the jury and advised HARVEY."

Please see Exhibit "F" - excerpt from the F.B.I. Supervisory Special Agent's investigation/interview with Judge Harvey.

Petitioner asserts that the reason for the lengthy jury deliberations is directly attributed to their inability to authenticate primary evidence (the missing/stolen money) presented and relied so heavily at trial by the prosecution. Thus, the jury was compelled to arrive at a verdict based on an inference (that this was in fact the  money that could be tied to the robberies) without ever having the opportunity to inspect, verify or authenticate the entered evidence.

Given this scenario, not only was the jury's right/duty abrogated but, it undermined Petiitoner Brown's right to be tried and judged solely on the evidence presented against him at trial.

Precisely because the missing money/evidence was primary evidence (and not secondary evidence - such as eyewitness accounts, etc.) and the actual material link to the robberies, it necessarily weighted very heavily upon the verdict in this case. The jury was not allowed to separate the prosecution's hyperbole/contentions from the actual evidence.

Had the jury known about this outreageous government conduct, it would have certainly altered the outcome. It appears that the judge in this case and/or Petitioner's attorney may have been aware that the evidence money had been stolen in the prosecutor's office. If so, it was the defense attorney's duty to request for a mistrial and if the judge had an indication that this ocurred, he too, should have sua pointe declared a mistrial - that was his duty.

As demonstrated in Exhibit "D" - Judge Davis apparently had a predisposition and/or shows improper bias in this matter by attaching a monicker/improper label to Petitioner's case.

As such, Petitioner respectfully requests a disposition/ adjudication from this Honorable Court and asserts that he has demonstrated that he could not have previously  discovered the newly-discovered evidence presented herewith and has made a prima facie showing that no reasonable factfinder would have found him guilty, pursuant to the provisions of 28 U.S.C. Section 2244 as well as the provisions of 28 U.S.C. Section 2241.

Respectfully submitted this 1st day of February, 2017.

Nacoe K. Brown
Petitioner

## CERTIFICATE OF SERVICE BY UNITED STATES MAIL

I, _____ Nacoe Ray Brown _____, hereby certify tha

have served a true and correct copy of the attached _____

_____ MOTION TO VACATE JUDGEMENT _____

_____ Writ of Habeas Corpus _____

by placing the same into a sealed envelope with First-class postag

fully pre-paid, and submitting the legal envelope to prison offici

at FCI Victorville Complex - Medium II, Mailroom Staff, in accorda

with the Federal Bureau of Prisons **"Special Mail"** procedures, and

pursuant to the provisions of **Houston v. Lack**, 487 U.S. 266, 108 S

2379, 101 L.Ed.2d 245 (1988), for delivery to the local Post Offic

addressed to: _____ Office of the US Attorney _____

_____ Central District fo California _____

_____ 312 N. Spring St. Room G-8 _____

_____ Los Angeles, CA  90012 _____

_____

I declare under the penalty of perjury that the foregoing

statements are true and correct pursuant to the laws of the United

States of America.

**EXECUTED** and **DATED** this _1st_ day of _February, 2017_ , 2014

Respectfully submitted,

_____ Nacoe RAy Brown _____
Declarant - Petitioner



**EXHIBIT "A"**

U.S. Department of Justice

Federal Bureau of Investigation
Washington, D.C. 20535

November 28, 2016

MR. NACOE RAY BROWN
#34730-037
FEDERAL CORRECTIONAL INSTITUTION RAY BROOK
POST OFFICE BOX 900
RAY BROOK, NY 12977

FOIPA Request No.: 1228493-000
Subject: BROWN, NACOE RAY

Dear Mr. Brown:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Explanation of Exemptions:

| Section 552 | | Section 552a |
|---|---|---|
| ☐ (b)(1) | ☑ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☑ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| Federal Rules of Criminal | ☐ (b)(7)(D) | ☐ (k)(2) |
| Procedure; Rule 6(e) | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

404 pages were reviewed and 371 pages are being released.

☐ Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

☐ This information has been referred to the OGA(s) for review and direct response to you.

☐ We are consulting with another agency. The FBI will correspond with you regarding this information when the consultation is completed.

☐ In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c) (2006 & Supp. IV 2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

# Midstate Mysteries: The death of federal prosecutor Jonathan Luna

By Ali Lanyon Published: November 30, 2013, 1:44 pm



Nearly 10 years ago, Baltimore U.S. Attorney Tom DiBiagio stood at a microphone in front of throngs of television cameras and vowed to seek justice for Jonathan Luna.

"We will find out who did this and we are dedicated to bringing the person responsible for this tragedy to justice," DiBiagio told reporters.

But all these years later, not much has changed. The final hours of Luna's life and the circumstances of his death are still shrouded in mystery.

It was December of 2003. Luna, 38, stayed late at work. He was prosecuting two suspected heroin dealers in Baltimore and was in his office crafting plea deals. Only one of them was finished when, without his glasses – which he apparently needed to drive – he abruptly left the courthouse. Also left behind on his desk: his cell phone and laptop computer.

After Luna left, with his work incomplete, he drove a mysterious path through four states: Maryland, Delaware, New Jersey and ultimately Pennsylvania. He got off the Pennsylvania Turnpike in Lancaster County near Ephrata. Investigators said there was a smudge of blood on his Turnpike ticket.

His body was discovered shortly after 5 a.m. the next morning by a worker behind Sensenig and Weaver Well Drilling in Brecknock Township.

The married father of two had been stabbed 36 times. But the cause of death, according to the coroner, was drowning. Luna was found face-down in a frigid stream.

Keisling became interested in the case years ago and penned a book. "The Midnight Ride of Jonathan Luna."

"He was trying to run away. He was terrified," author William Keisling said.

"It was a murder. It was clearly a murder. The guy had been viciously killed," Keisling said.

The Lancaster County coroner at the time agreed and ruled the case a homicide. Few people at the time questioned that ruling, given that Luna was stabbed repeatedly.

*EXHIBIT "B"*

But a short time later, reports surfaced that the FBI was pressuring the coroner to change the ruling to suicide. Investigators said the weapon that inflicted the wounds was likely Luna's own penknife.

"The police reports say there was a pool of blood in the rear passenger seat. So what are they saying … that a U.S. attorney was driving across four states stabbing himself in the back, cutting his throat?" Keisling said. "Is the Justice Department hiring insane people? It's ridiculous."

But some still believe it's not so incredible.

Luna was under investigation for the disappearance of missing money from a bank robbery case he had prosecuted about a year before his death. The reported sum of the missing cash was $36,000. You'll recall he was stabbed 36 times.

Was Luna trying to stage some sort of an attack to deflect attention about the missing money? Did he simply go too far?

From the outside, Luna's life appeared to be an example of the American dream. Raised in a poor neighborhood in the Bronx, the eloquent Luna excelled in academics and worked his way through law school in North Carolina. His wife was a doctor and they had two young sons.

But the idea that his life wasn't as perfect as his brilliant smile let on was slowly leaked to the press after his death. Rumors almost immediately began swirling about problems with work, money and his marriage.

"The guy was repeatedly lynched," Keisling said. "He was killed in this vicious manner and then he was totally destroyed of character and reputation."

Instead, Keisling after years of research believes that Luna's death was likely linked to his final trial. He said court transcripts show the case was falling apart and that Luna was clearly uncomfortable with the plea deal he left unfinished that night because it would have forgiven a suspected drug-related murder.

Keisling said the court transcripts also show that the trial had exposed the possible mishandling of a confidential FBI informant.

He believes that could be a very powerful motive for murder.

And he's not alone.

When state Representative Mark Cohen (D-Philadelphia) heard the idea that Luna's death was anything other than a vicious murder, he wrote to the Justice Department, asking for an independent investigation.

"I believe more likely than not he was killed by somebody either active in the drug trade of in the employ or somebody active in the drug trade," Cohen said. "It's just a very odd situation and it's a depressing situation. It sort of indicates that, under some limited circumstances, people can get away with things."

Cohen's request for an independent investigation was denied.

"They don't want the public to look at this," Keisling said. "Instead, they want the public to think he traveled across four states stabbing himself in the back, slitting his own throat, slashing his own hands."

In his book, Keisling writes about an interview with an undertaker who prepared Luna's body for his wake. He said the woman described a large slit across Luna's throat, defensive wounds on his hands, and knife injuries to the prosecutor's scrotum.

He also points out that Luna's car was equipped with an EZ Pass, but it was only used in the beginning of his mysterious trip that night. Why would a man with an EZ Pass start out using the device and then begin taking paper tickets?

It's all evidence that would hardly support a suicide or accidental death theory, according to Keisling.

"He deserves better than this," Keisling said somberly.

When asked about the Luna case, the FBI referred abc27 to the Pennsylvania State Police. State police declined a request for an on-camera interview regarding the investigation. They also refused to say if the case is considered a homicide. They said, however, that they don't consider the investigation to be cold.

"This, just like any unsolved case, is still given plenty of attention by investigators. We are open to any information from the public that would help the investigation," police said in an email.

Lancaster County District Attorney Craig Stedman said he considers the death of Jonathan Luna to be a homicide. The current Lancaster County coroner did not return several phone calls from abc27 regarding the case.

Tom DiBiagio, Luna's boss who vowed to seek justice 10 years ago, did not return repeated phone calls to his private law practice.

There is an FBI reward of $100,000 for information that would lead to a resolution in the case. The toll free number for tips is 1-800-332-6039.

# Jonathan Luna and the FOIA request

By: Danny Jacobs Daily Record Legal Affairs Writer August 2, 2014

As I was searching through federal court filings last week, I noticed a request to unseal a 13-year-old document filed by prosecutors.

"The reason for which the United States originally sought to have these documents sealed no longer exists and the documents can and should be unsealed," Assistant U.S. Attorney P. Michael Cunningham wrote.

The motion was filed July 29 and granted the same day.

The now-unsealed document is below. At the very top, it says the filing is an application for "historical records of electronic communications." What stopped me in my tracks was the name in the third line of the application, the same name signed on the last page:

Jonathan P. Luna.

Luna was an assistant U.S. attorney whose body was found in December 2003, face-down in a creek in central Pennsylvania with 36 stab wounds. The local coroner's office ruled Luna's death a homicide, but the FBI has said Luna was alone the night of his death. The investigation remains open.

Further down in the application was the name of the person whose cell phone records prosecutors wanted: Nacoe Ray Brown. Back in the summer of 2001, Brown had just been indicted on a string of bank robberies and attempted bank robberies from a few months earlier.

Brown was convicted and sentenced to 25 years in prison in 2002. His trial was notable for the fact that $36,000 in cash used as evidence in the trial disappeared. According to a Baltimore Sun story from less than a week after Luna's death:

*EXHIBIT "B"*

*The sources cautioned that nothing links Luna, 38, to the missing cash, or the money to his slaying. But the case stands out among Luna's files, all of which were being closely examined as authorities continued to search for suspects in Thursday's killing.*

The money went missing "in transit between the courtroom and a government storage area," The Sun reported. Luna signed an agreement with other lawyers in Brown's case that all exhibits had been property returned, according to The Sun, which also quoted a "law enforcement source" saying Luna had about $25,000 in credit card debt at the time of his death.

With some context on the application for phone records, I had one question: Why did prosecutors unseal it after 13 years?

Marcia L. Murphy, a spokeswoman for the U.S. Attorney's Office in Baltimore, said it was done in response to a Freedom of Information Act request. She did not know who requested the information because all FOIA requests for the office are handled by the Department of Justice.

Wyn Hornbuckle, a spokesman for the department, said Friday officials there would not tell me who requested the application. He cited an exemption in FOIA that allows federal officials to withhold "information involving personal privacy."

In other words, I'll need to file a FOIA request to see who filed a FOIA request to see an application for cell phone records filed by Jonathan Luna.

I'll keep you posted.

*EXHIBIT "B"*

**TRULINCS  34730037 - BROWN, NACOE RAY - Unit: RBK-N-B**

--------------------------------------------------------------------------------

FROM: Brown, Vanassa
TO: 34730037
SUBJECT: 2009 Article - pt. 1
DATE: 12/09/2014 02:06:10 PM

Nearly 6 Years Later  Fed Prosecutor Jonathan Luna: Murder Victim or Suicide?

Posted By allan On July 9, 2009 @ 10:53 am In FBI,Special Report | No Comments
By Jeffrey Anderson
For ticklethewire.com

WASHINGTON   For nearly six years now the death of congenial and free-smiling Baltimore federal prosecutor Jonathan Luna has remained a mystery. Theories still range from suicide, to accident, to murder by an informant, and yes, even by a federal agent, as an author of a book on Luna suggests.
One constant has been the refusal of federal authorities to comment much beyond the pat response, insisting that Luna, who was found face down on Dec. 4, 2003, in a shallow creek in Lancaster County, Pa., with 36 shallow stabs and pricks, is still the subject of an "open investigation."
A recent letter from the Lancaster County District Attorney s Office has breathed new life into that assertion.. Yet it also has added tantalizing detail beyond what the feds will confirm, and raises questions about what is really going on with the so-called Luna investigation.

The letter, written by Lancaster County Assistant District Attorney Susan E. Moyer on May 6, is addressed to William Keisling, author of the conspiracy-minded tome "The Midnight Ride of Jonathan Luna," and explains why the office can t provide Keisling with the Luna autopsy results..

"Conversations with the Chief of the Violent Crimes Unit for the United States Attorney s Office for the Eastern District of Pennsylvania have revealed that the Luna investigation is an open and ongoing federal criminal investigation in which the leads are continuously being developed and additionally that the Luna case is part of an open federal grand jury investigation."

Assistant U.S. Attorney David Webb, the Philadelphia-based chief of the violent crimes unit whom Moyer is referring to, says his office s policy is to not comment on such matters. And the existence of a federal grand jury investigation is supposed to be secret.

The questions are: Is the Lancaster County D.A. s office interpreting the conversation with the feds correctly when it says "leads are continuously being developed" in a federal grand jury investigation? And was the U.S. Attorney s Office really being forthright? Some skeptics wonder.

The Luna case continues to be one of federal law enforcement s more painful and confounding mysteries. Investigators hate to see cases go unsolved. They doubly hate it when it involves one of their own.

But to add to the confusion, the D.A. s statement flies in the face of a different reality acknowledged by Luna s former colleagues in the U.S. Attorney s Office in Baltimore: Despite a ruling by the Lancaster County Coroner that Luna s death was a homicide, for years now they say there has been no active federal investigation; and classifying it as "open" amounts to a legal fiction that simply preserves sensitive aspects of the case and respects the memory of Luna and the feelings of his family, particularly the father, Paul Luna, who insists that his son was murdered. He s not buying the theory the FBI in Baltimore has long subscribed to that Jonathan Luna committed suicide.

"That s not true," Luna s father told the now-defunct Baltimore Examiner eight months ago. "He was killed."

Furthermore, although there is no consensus   and the evidence defies a conclusive theory   there is a grudging acceptance among those who knew Luna that he most likely killed himself   either intentionally or unintentionally.

"It s tragic, and sad, and we may never know what really happened, but the reality is there are no credible leads to suggest he was murdered," says a veteran high-ranking prosecutor in the U.S. Attorney s Office in Baltimore, who says there is no indication that leads are being developed "continuously" or otherwise. "But closing the case would be a slap in the face to his family and to those who feel strongly to the contrary. So the decision, as I understand it, is to leave the case open and do nothing."

"Like everyone else we all thought it had to be murder at first, but now it appears more likely he committed suicide," says

TRULINCS  34730037 - BROWN, NACOE RAY - Unit: RBK-N-B            *EXHIBIT "B"*

--------------------------------------------------------------------------------------------

another top prosecutor in the office, pointing to Luna s troubled personal and professional life. "He was suspected of theft, he had run up credit card bills, there was some other shady stuff, and eventually even his friends reluctantly concluded it was suicide. Some resist that conclusion, others resist talking openly out of respect for his family, but the reality is the case has been open but inactive for a long time."

A former federal prosecutor and colleague of Luna who now practices criminal defense law in Baltimore, agrees.

"I m not sure closure was ever reached, as the investigation was removed from the Baltimore office and transferred to Philadelphia [to the U.S. Attorney's Office for the Eastern District of Pennsylvania]. Our understanding was that the investigation stopped short of an official announcement. They can legitimately say it s open so if new information arises they can look at it.

But if it s true that his death was self-inflicted, then they did not want any more public pronouncements. It s a law enforcement respect issue at this point."

The 38-year-old prosecutor, a bootstrap kid from the Bronx, disappeared on the night of December 3, 2003. He had been at the office late in downtown Baltimore, working out a plea agreement in a major heroin trafficking case and was expected to return shortly before midnight to his two-story townhouse on a cul-de-sac in Howard County, outside of Baltimore, where he lived with his wife Angela, a physician, and their two young children.

Instead, authorities believe he drove north on Interstate 95; crossed into Delaware; made a cash withdrawal south of Philadelphia; stopped for gas in King of Prussia, northwest of Philly; continued west on the Pennsylvania Turnpike and exited south of Reading about 3:30 a.m., according to a toll ticket. In the morning, an employee of a well-drilling company in Brecknock Township, in the middle of Pennsylvania Dutch country, about 100 miles north of Luna s office, spotted Luna s 1999 silver Honda Accord in a ditch with the lights on and the engine running.

The car was smeared with blood and Luna, still in a suit, overcoat and tie, with his electronic security pass around his neck, lay face down in the shallow creek, stabbed and pricked 36 times with a knife.

A murder investigation ensued, yet the evidence failed to lead investigators to a likely suspect in Luna s late night, three-state odyssey, despite the Lancaster County Coroner s ruling, which concluded that it was a homicide by multiple traumatic wounds and drowning.

EXHIBIT "B"

# Money stolen, found and missing again

**Cash:** Up to $38,000 used as evidence in a bank robbery trial has disappeared, officials say.

*By Gail Gibson*
SUN STAFF

As they wrapped up a two-week bank robbery trial in U.S. District Court in Baltimore, federal authorities discovered another possible crime — some key evidence, more than $36,000 in cash, had disappeared.

FBI officials confirmed yesterday that agents are investigating what happened to evidence money used in the trial of Naoce Ray Brown, who was convicted last week in a string of violent Baltimore County bank robber-ies.

Special Agent Barry A. Maddox, an FBI spokesman, declined to discuss the evidence investigation in detail or say how much money is missing. But law enforcement sources said $36,000 to $38,000 was gone, and that FBI agents had interviewed numerous courthouse employees this week.

The money was determined to be missing as attorneys packed up after a jury had returned its verdict against Brown last Thursday, said U.S. District Judge Andre M. Davis, who presided over the trial and was astounded by the discovery.

Davis said investigators have indicated that the money apparently was not taken from his courtroom, but that it likely was lost somewhere between the courtroom

[See Money, 8a]

## Evidence money is missing

[Money, from Page 1A]

and government storage used to hold sensitive evidence during trials.

"My understanding is it wasn't taken out of the courtroom, and that gives me a very narrow measure of relief," Davis said. "The bureau is undergoing a very thorough, professional investigation, and we can just await the outcome."

Officials with the U.S. attorney's office did not respond yesterday to requests for comment.

Federal prosecutors and the FBI agents assigned to the case would have been directly responsible for the money. Such evidence, along with items such as guns and drugs, typically is kept locked in a secure area except for the brief period when it is introduced at trial.

The missing money provided odd punishment to a high-profile bank robbery case with its own curious twists.

Brown, 34, of Baltimore, was charged with another man in connection to four Baltimore County robberies last year that gained attention for the level of violence, the amount of money taken and the robbers' many disguises. In one robbery, the gunman wore hospital scrubs and a stethoscope; in another, a suit and black fedora, according to an affidavit by the FBI's lead investigator in the case, Special Agent Anthony M. Campano.

Prosecutors said Brown was the hold-up man in four robberies that netted more than $450,000. He was convicted on three counts of bank robbery; jurors deadlocked on a fourth count.

The other defendant, Kevin L. Hilliard, pleaded guilty to his role in one robbery and testified against Brown at the trial. Hilliard said the Brown told him God had directed him in a vision to rob banks as a way to fund his struggling gospel dinner theater in downtown Baltimore, Marv's Place on Guilford Avenue, closed.

Court records show that it was during a search of Hilliard's home that FBI agents found in a safe about $88,000 in cash, some of it in wrappers from banks that had been robbed.

A list of government exhibits introduced at trial makes two references to cash — one exhibit was listed as "Money from Hilliard's safe," another was identified as "Money recovered from Hilliard on arrest."

A stipulated agreement that all exhibits in the case had been returned was signed on the last day of the trial by each of the attorneys in the case — Assistant U.S. Attorneys Jonathan P. Luna and Jacabed Rodriguez-Coss and defense attorney Kenneth W. Ravenell.

Ravenell said yesterday that at trial, government lawyers asked Hilliard to identify the cash seized from his safe as coming from the bank robberies. Ravenell said the money was heat-sealed in two or three separate bags and that each one was extremely bulky because the denominations were relatively small.

The missing bag of money contained as much as $38,000, apparently in $20 bills, according to law enforcement sources close to the investigation.

Ravenell said the money was in the courtroom for only the short period when it was identified by Hilliard and introduced as evidence. After that, he said the evidence apparently was taken to a secure area by government agents or attorneys, who typically wheel case files and evidence boxes through the courthouse on rolling carts.

"These were not the little stacks of ... hundred-dollar bills," Ravenell said. "It's just something that, in my opinion, is just going to fall off the cart in the hallway and no one would notice."

Ravenell said he had not been interviewed by FBI agents and learned about the missing evidence during an unrelated appearance in Davis' courtroom this week. He said the evidence probe would not affect his client's case or sentencing, which is scheduled for December 13.

"The money was there during the trial," Ravenell said. "What they did with it after, I have no idea."

Search uncovers Luna's penknife

*EXHIBIT "B"*

*Feb. 13, 2004*



http://www.baltimoresun.com/news/local/bal-md.luna13feb13,1,278209.story

# Search uncovers Luna's penknife

## Federal prosecutor, 38, was likely stabbed with it, investigators believe

By Gail Gibson
Sun Staff

February 13, 2004

Authorities probing the mysterious death of Baltimore federal prosecutor Jonathan P. Luna now think the young lawyer likely suffered from stab wounds inflicted with his own pocketknife and are re-examining financial records that may shed more light on the final months of Luna's life.

In a recent recanvassing of the rural Pennsylvania field where Luna's body was found, investigators found a penknife that they believe caused his wounds, according to two federal law enforcement sources. They also said that investigators believe the pocketknife is the one that Luna regularly carried.

Luna was stabbed 36 times and found Dec. 4 facedown in a shallow creek in rural Lancaster County, Pa., where authorities said he drowned. His Honda Accord was nearby, its engine running.

It was not known yesterday whether authorities found fingerprints or blood on the knife, or why the weapon was not discovered during an extensive search of the scene on the day Luna was found.

The discovery of the knife comes as investigators also have sought help analyzing medical and psychological evidence from a well-regarded military forensics unit as they struggle with a new, competing theory about one of the most basic questions in the case: whether Luna was the victim of a homicide or suicide.

In FBI reports over the past month, authorities have raised the possibility that Luna, 38, could have killed himself, according to three law enforcement sources who spoke with The Sun on condition of anonymity. The controversial theory has met sharp skepticism internally, however, by a number of investigators who maintain that the evidence points to homicide.

Officials with the FBI's Baltimore field office, which has headed the investigation, have declined to comment on any of the theories that authorities are pursuing to solve the mystery of Luna's death.

"All I can say is the investigation continues," said Special Agent Barry Maddox, a spokesman for the office.

Luna's boss, Maryland U.S. Attorney Thomas M. DiBiagio, has not commented on the investigation since the night that it began, when he said preliminary evidence suggested Luna had been murdered. Vickie E. LeDuc, a spokeswoman for the prosecutor's office, also declined to comment, as has Luna's family.

http://www.baltimoresun.com/news/local/bal-md.luna13feb13,1,4453205,print.story

4/9/2004

Search uncovers Luna's penknife

*EXHIBIT "B"*

The energetic and well-liked young prosecutor, who was married and had two young sons, was due in federal court in downtown Baltimore to conclude a drug case on the day that he was found dead. But investigators found no evidence that his death was related to his work, and instead have closely combed Luna's personal life for clues.

## Loan application

In recent days, investigators have again turned their attention to the unsolved disappearance of about $36,000 introduced as evidence in a bank robbery trial that Luna prosecuted in September 2002. Authorities have not linked the missing cash to Luna or to his death, but investigators now are examining a loan application that Luna filled out online about the time of the trial.

The loan application was for about $30,000, and it was canceled not long after the period when the evidence money was discovered missing, according to a federal law enforcement source. Authorities have determined that at the time of his death, Luna had credit card debts of about $25,000 — and that he had as many as 16 credit card accounts, some that he held without his wife's knowledge.

In addition to financial troubles, Luna also had felt that he was on the outs with his supervisors in the U.S. attorney's office, where he had worked for four years. Several legal sources have said that Luna was concerned he might have to change jobs. DiBiagio has rejected any suggestion that Luna was at risk of being fired.

The highly sensitive question of whether Luna could have killed himself is at the center of a debate among investigators about the direction of the case, as it stretches into a third month with no arrests. To better develop the theory, investigators have asked the Armed Forces Institute of Pathology to examine medical and psychological evidence in the case.

A spokesman for the institute referred all questions about the Luna case to the Baltimore FBI office.

Autopsy findings by the medical examiner in Lancaster County, Pa., have not been made public, and forensic pathologist Dr. Wayne K. Ross, who performed the autopsy, has refused to discuss the case. However, the county's then-coroner, Dr. Barry Walp, said in the first days of the investigation that Luna had suffered a number of shallow "prick" marks on his chest and neck in addition to several deeper, more serious stab wounds.

While rare, there are some high-profile instances of suicides by stabbing, cases frequently marked by so-called "hesitation wounds" that barely penetrate the skin. In 1999, Army officials ruled that a National Guard captain found dead at a Kentucky base with 26 stab wounds to the neck and chest was a suicide, a finding that was disputed by the soldier's family.

More recently, the stabbing death in December of Oscar-nominated singer-songwriter Elliott Smith -- initially thought to be a suicide -- remains an open question after the Los Angeles coroner's office said it could not determine whether stab wounds to Smith's chest were most likely inflicted by him or by someone else.

If authorities conclude that Luna's death was a suicide, the finding could open investigators to allegations that they simply failed to solve the high-profile case.

Already, the case has been marked by competing jurisdictional issues between authorities in Pennsylvania and Maryland. In addition, officials in Washington are investigating whether some

Search uncovers Luna's penknife

*EXHIBIT "B"*

supervisors in the FBI's Baltimore office overreached in questioning a female agent in connection with the Luna case, a law enforcement source has told The Sun.

## Internal probe

The Justice Department's Office of Professional Responsibility has opened an investigation into whether supervisors improperly questioned an agent who had worked on several cases with Luna about her personal life and told her to turn over her computer for inspection, the source said.

The internal investigation was first reported Wednesday evening by CBS News.

A federal law enforcement official said yesterday that there has been no finding in the internal probe and emphasized that investigators never considered the agent a suspect in Luna's death — "nor have they developed any suspect," the source said.

In Luna's case, sources have described evidence that appears to run counter to a suicide theory. Officials have said that some of Luna's wounds appear to be defensive and have said that authorities found evidence of a second blood type in Luna's Honda Accord, possibly from an attacker.

Investigators also found blood on the Pennsylvania Turnpike toll ticket that they believed was turned in in rural Ephrata, Pa., when Luna's car exited the highway on the night he was killed. The ticket suggested to investigators the possibility that someone other than Luna was driving the car when it entered and left the Pennsylvania Turnpike because Luna's car had an EZ Pass card, something a driver unfamiliar with the vehicle might not have known.

In the two months since Luna's death, agents also have pored over Luna's financial records, computer files, phone logs and personal contacts in his Palm Pilot, but none of the information has led authorities to a potential suspect.

*Copyright © 2004, The Baltimore Sun*

*EXHIBIT "C"*





**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

DEC 22 2004

Kevin L. Perkins
Special Agent in Charge
Federal Bureau of Investigation
Baltimore Field Office
7142 Ambassador Road
Baltimore, MD 21244

Re:    Theft of $36,750 in U.S. Currency (Evidence in a Bank Robbery Trial)
       from the U.S. Attorney's Office in Baltimore, Maryland

Dear Special Agent in Charge Perkins:

        The Public Integrity Section of the Criminal Division has reviewed the above-referenced matter relating to the alleged theft of $36,750 in U.S. currency used as evidence in a bank robbery trial prosecuted by the United States Attorney's Office for the District of Maryland in Baltimore. After thoroughly investigating this matter, we have decided to decline prosecution. We understand that your office agrees with this decision.

        If you have any questions regarding this matter, please contact Trial Attorney                          b6
                                    Thank you for your extensive cooperation in this matter.                     b7C

                        Very truly yours,

                        Noel L. Hillman
                        Chief
                        Public Integrity Section

DEC 27 2004

52B-BA-102647-195

*EXHIBIT "C"*

**U.S. Department of Justice**

Criminal Division
Office of Enforcement Operations
Washington, D.C. 20530

CRM - 201200378P

Nacoe Ray Brown, Reg. No. 34730-037
FCI McDowell
P.O. Box 1009
Welch, West Virginia 24801

JUN 2 7 2012

Dear Mr. Brown:

The U.S. Department of Justice, Criminal Division, Office of Enforcement Operations and Freedom of Information Act and Privacy Act (FOIA/PA) Unit is in receipt of your correspondence dated May 03, 2012. Our office is charged with the responsibility of reviewing and responding to Freedom of Information Act (FOIA) requests for the U.S. Department of Justice, Criminal Division for records under 28 C.F.R Part 16. It does not appear that you are requesting Criminal Division documents under the FOIA at 5 U.S.C. § 552 nor the Privacy Act at 5 U.S.C. § 552a.

In your letter you requested information related to a Federal Bureau of Investigation (FBI) FOIA request you sent to the FBI, which relates to the disappearance of money ($36,000) from a bank robbery trial. Specifically, you mentioned that the information you seek is related to your federal case, # 01-cr-00377 from the United States District Court, Maryland. The Criminal Division does not maintain the records that you are seeking.

In relation to your case, for your information, United States Attorneys nationwide are responsible for handling litigation affecting the interests of the United States, including the prosecution of criminal cases. These offices maintain records on their legal cases, criminal investigations, and records relating to the administration of the office. Legal case files are located in the office of the United States Attorney who handled the case.

The Criminal Division does not maintain records about cases prosecuted by Assistant U.S. Attorneys. The Executive Office for United States Attorneys (EOUSA) processes records on behalf of U.S. Attorney's Offices. Accordingly, requests for United States Attorney records should be sent to the EOUSA. Consequently, you may want to direct your request to the EOUSA for processing and their direct response to you. We note that in your letter you state that you have directed your request to the EOUSA.

In reference to your FBI FOIA request, you mention in your letter that you have corresponded with the FBI and also directed your request to its office. Therefore, please refer any questions or concerns in this matter to the EOUSA and/or FBI directly.

Sincerely,

Rena Y. Kim, Chief
FOIA/PA Unit

(For)



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

SEP 2 6 2012

Mr. Nacoe R. Brown
Register No. 34730-037
Federal Correctional Institution          Re:    Appeal No. AP-2012-02885
Post Office Box 1009                              Request No. CRM-201200378P
Welch, WV 24801                                   ADW:ADF

Dear Mr. Brown:

  You appealed from the action of the Criminal Division of the United States Department of Justice on your request for access to records concerning an investigation relating to the disappearance of money from a bank robbery trial.

  After carefully considering your appeal, I am affirming the Criminal Division's action on your request. The Criminal Division informed you that it does not maintain records such as those that you described. I have determined that the Criminal Division's response was correct.

  Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the actions of the Criminal Division in response to your request.

  If you are dissatisfied with my action on your appeal, the Freedom of Information Act permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

*Kenneth Caulter/for*

Janice Galli McLeod
Associate Director



*EXHIBIT "C"*



**U.S. Department of Justice**
Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

**April 24, 2014**

Mr. Nacoe R Brown
Register No. 34730-037
Federal Correctional Institution
Post Office Box 1009
Welch, WV  24801

Re:   Appeal No. AP-2013-04292
      Request No. 1038199-002
      SRO:RRK

**VIA: U.S. Mail**

Dear Mr. Brown:

You appealed from the action of the Federal Bureau of Investigation on your request for access to records concerning yourself. I note that you have limited your appeal to an appeal of the responsiveness of the documents sent to you in the FBI's May 15, 2013 response to request number 1038199-002.

After carefully considering your appeal, I am affirming the FBI's action on your request. While you contend that the records processed by the FBI are not responsive to your request, I note that your request broadly sought any FBI records concerning your criminal case. I have determined that the FBI's action was correct and that it conducted an adequate, reasonable search for responsive records subject to the Freedom of Information Act.

To the extent that you assert that your request sought only records concerning Jonathan Luna or "'Theft of Evidence' at the U.S. District Courthouse 101 West Lombard St., Baltimore, MD," I note that you have previously made separate requests for such records to the FBI that have been handled under separate request numbers, including Request No. 1169167. Further, this Office adjudicated the FBI's action on that request in Appeal No. AP-2012-03148.

Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the actions of the FBI in response to your request.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue

FD-302 (Rev. 10-6-95)

*EXHIBIT "D"*

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    08/01/2003

JONATHAN PAUL LUNA, Assistant United States Attorney (AUSA), United States Attorney's Office, 101 West Lombard Street, Baltimore, Maryland 21201, was advised of the identity of the interviewing agent, the nature of the interview, and provided the following information:

JONATHAN PAUL LUNA, date of birth: October 21, 1965, Social Security account number 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, who resides at ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ advised the writer he was the main prosecutor on the NACOE BROWN bank robbery trial.    b6  b7C

JONATHAN LUNA recalled that on the September 23, 2002 **when he** showed the bait money to Special Agent (SA) ⬛⬛⬛⬛⬛⬛ who was on the witness stand, he was not sure if **the K-pack** had been opened and the monies position manipulated by **SA** ⬛⬛⬛ prior to his testimony. Earlier in the trial prior to testimony, the money was shown in a sealed K-pak to a bank teller to identify straps surrounding the money. LUNA could not recall whether the box holding the K-pak of money was on the bottom or top of the evidence cart at any time during the trial. LUNA remembers on one occasion seeing the cart unaccompanied in the courtroom. LUNA recalls remembering leaving the box of **valuable evidence** in the courtroom when it was secured at lunch time. The cart was left in the courtroom many times during lunch. Usually, SA ⬛⬛⬛⬛⬛ would take the box of money and other valuable evidence up to the trial preparation room to be secured while they were eating lunch.

Prior to departing the courtroom after the jury entered the jury room for deliberations, LUNA recalls reviewing each item of evidence for determination of pertinence regarding the jury's deliberations with the court deputy and the defense attorney. LUNA advised he cannot recall checking each individual K-pak of money, however, this would have been done in front of the Court Security Officer guarding the jury room in the courtroom.

LUNA advised it was his decision to bring the money to the courtroom for display during the trial. This was particularly pertinent because of the straps initialed by the various tellers which were found in the safe ⬛⬛⬛⬛⬛⬛⬛⬛ home. Once ⬛⬛⬛⬛⬛ the teller testified to the accuracy of the initials, there was no

*52-BA-102647-164*

Investigation on    **7/30/03**    at **Baltimore, Maryland**

File #    **52B-BA-102647**    Date dictated    **7/30/03**

by    **SA** ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

213 ⬛⬛⬛⬛  02.302

FD-302a (Rev. 10-6-95)

*EXHIBIT "D"*

52B-BA-102647

Continuation of FD-302 of   JONATHAN PAUL LUNA   , On 7/30/03   , Page   2

reason to continue bringing the money to court with the exception
of the bait bills to be identified [          ]   It was an oversight
that this money was still brought to court and trial each day.
LUNA advised his focus was primarily on the witness list, the judge
and the jury and he was not paying particular attention to the
smaller details such as the valuable evidence being handled by
[          ]

      LUNA advised [          ] was afforded a key to the
trial preparation room on the sixth floor prior to the trial
starting and the key was returned by Special Agent [          ] after
the trial ended.  At all times that LUNA observed the box
containing valuable evidence, to include jewelry and money, the box
cover was flipped and folded over in a manner that would make its
contents obscured from someone looking at the box.  LUNA himself
did not have a key to the trial prep room.

      LUNA recalls that the trial prep room was not always
locked as it was supposed to be.  In one instance, one of the
witnesses, believed by LUNA to be the manager of a car dealership
where one of the subjects purchased a Mercedes, was brought to the
trial preparation room prior to his testimony for trial
preparation.  LUNA, advised at this time, the door was unlocked to
the trial preparation room even though no one was there.  This
witness did not have access the boxes and did not know of the
monetary evidence being used in the case.

      LUNA advised this case is currently under appeal,
however, none of the appeals are based upon the missing money.

      LUNA recalls celebrating the conviction of NACOE BROWN at
a restaurant in Columbia with his wife after the trial.  While
having dinner, LUNA took a telephone call from SA [          ] who
advised while he was re-entering the evidence into the evidence
room some of the money turned up missing. LUNA advised [          ] to
go to the courthouse.  LUNA then stated [          ] believed to be
[          ] Court Security Officer, brought SA [          ] up to the
courtroom.  [          ] going through the courtroom, asked [     ] for
access into the U. S. Attorney's Office which was denied by
[          ] LUNA advised [          ] to put him on the phone with [   ] who
recognized LUNA's voice.  LUNA verbally gave [          ] the
authorization for him to accompany [          ] up to the sixth
floor of the United States Attorney's Office.  According to LUNA,
[          ] did, in fact, escort [          ] to the sixth
floor to search for the missing money.

b6
b7C

*EXHIBIT "D"*

FD-302a (Rev. 10-6-95)

52B-BA-102647

Continuation of FD-302 of    JONATHAN PAUL LUNA    , On  7/30/03    , Page    3

    LUNA could not recall who put evidence stickers or exhibit stickers on the various K-pak. However, he was not sure if [ ] had any reason to touch the evidence, particularly, the K-pak's of money. LUNA advised Judge DAVIS' court deputy, [ ] (LAST NAME UNKNOWN - LNU) would have had a possible reason to touch the bait K-pack as it was displayed by him to the witnesses. LUNA does not recall publishing (passing for inspection) any of the money contained in a K-pak to the jury. The only item LUNA can recall publishing to the jury was a K-pack of hair which [ ] obtained during the detention of NACOE BROWN.

    LUNA does recall after the trial was completed, [ ] was "busting on" Special Agent [ ] regarding the evidence cart as she ended up walking the evidence cart back to the trial preparation room. LUNA did advise that he anticipates [ ] being transferred back to the U.S. Attorney's Office in Puerto Rico if her husband, a Special Agent with the Federal Bureau of Investigation (FBI) is transferred back to Puerto Rico.

    LUNA advised that he did not take the money in question nor had any knowledge or suspicions regarding individuals who may have taken the money. LUNA did advise the Clerk's Office had knowledge of the money being in the courtroom, as well as several of the Court's employees. LUNA inquired as to whether Judge DAVIS' deputy, a young female who had braids in her hair, was interviewed regarding the missing money. LUNA advised that he was willing to submit to a polygraph regarding the missing money in this matter and would be agreeable to providing fingerprint exemplars for comparison against latent print developed in this matter.

    The interview memorialized above began at 10:30 a.m. and was finished at 11:40 a.m. AUSA LUNA was provided with the FD-302 dated 9/27/02 regarding his first interview after the evidence was determined to be missing.

b6
b7C

FD-498 (Rev. 1-28-99)

# POLYGRAPH REPORT

EXHIBIT "D"

b6
b7C
b7E

| Date of Report | Date of Examination | Case ID # |
|---|---|---|
| 04/02/2003 | 04/02/2003 | 52B-HQ-102647 |

Field Office/Agency Requesting Examination

FBI, Baltimore

| Authorizing Official | Date Authorized |
|---|---|
| SAC, Baltimore | 03/24/2003 |

Examinee's Name (Last, First, Middle)

Case Title:

UNSUB(S);
THEFT OF $36,750 U.S. CURRENCY
IN EVIDENCE AT U.S. COURTHOUSE
101 W. Lombard St.,
Baltimore, Maryland;
09/23/2002 - 09/26/2002;
TGP; OO: BA

030407520

Case Synopsis/Examiner's Conclusion:    On 09/09/2002, the bank robbery trial of Ray Brown began in U.S. District Court, Baltimore, MD., in Courtroom 5B. During the trial, $63,128 in U.S. currency, contained in seven (7) heat-sealed plastic packets was presented in evidence. The money was signed out of the FBI evidence room by case agent SA          who transported the evidence back and forth between the trial prep room, on the 6th floor of the courthouse, and the courtroom. After the trial, upon taking the evidence back to the FBI evidence room, it was determined that one of the seven packets, containing $36,750, was missing. It was determined that the theft occurred between 2:00 pm, 09/23/02 and 2:00 pm, 09/26/02, most likely from the trial prep room, which is normally locked when containing evidence.
     Eighty-five interviews were conducted of various personnel at the courthouse and it was determined that there were at least seven keys which would open the trial prep room door and anyone on the sixth floor could have possibly accessed a key from the key rack maintained by the physical security specialist. There were also brief periods of 5-15 minutes where the door may have been left unlocked while the money was unattended inside                              was interviewed regarding the stolen money and denied any knowledge of the theft or access to the room key. Because he throughout the sixth floor and could conceivable conceal the packet                    it was requested he be polygraphed.
     On 04/02/2003,          was offered a polygraph examination and agreed to the exam. He voluntarily read and signed an FD-395 (Advice of Rights) and FD-328 (Consent to Polygraph With Interview.          was then afforded a polygraph examination consisting of the following relevant questions:

SERIES I

     It is the opinion of the examiner that the recorded responses for SERIES I

SERIES II

     It is the opinion of the examiner that the recorded responses

Examiner's Name ___ SA

FD-302 (Rev. 10-6-95)

*EXHIBIT "D"*

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/30/2002

ANDRE M. DAVIS, United States District Court Judge, District of Maryland, U.S. Courthouse, 101 West Lombard Street, Suite 5B, Baltimore, Maryland, 21201, telephone (410-962-0801, was advised of the nature of this brief interview and the official identities of the below listed FBI Special Agents (SAs). DAVIS was interviewed at his Judge's Office, concerning the theft of $36,750.00 in U.S. Currency, that had been presented in a trial he presided over. DAVIS thereafter provided the following information:

DAVIS confirmed he did preside over the Federal Bank Robbery trial of subject NACOE RAY BROWN. He described this trial as the, [                    ] He described the trial this way because subject BROWN twice signed plea agreements, and later broke the agreement and BROWN attempted to escape from custody, by having several hacksaws mailed ti him in jail.   The Federal Prosecutors were Assistant U.S. Attorney (AUSA) [                    ] and          b6 AUSA JONATHAN LUNA.  The FBI Case Agent was SA [                    ]     b7C The trial started on Monday 9/9/2002, and proceeded for approximately three (3) weeks, concluding on 9/26/2002 with a guilty verdict.

DAVIS was unaware that the large cardboard box, maintained by SA [          ] contained numerous valuables, U.S. Currency, and specifically a plastic package of $36,750.00. DAVIS became aware that there was money in the cardboard box when two FBI SAs were on the witness stand during the trial. DAVIS saw one of the Assistant United States Attorney's personally open the cardboard box, and displayed the entire seven (7) packages of sealed money in the Courtroom. This occurred during the testimony of SA [          ] and then right after that during the direct testimony of SA [          ] on the witness stand. The money was placed on the witness stand directly in front of both SAs as they testified. DAVIS remembers this because, the money was pilled high on the witness stand, almost blocking the face of the SAs who were testifying.

During the trial, DAVIS noticed no one taking any special interest in the boxes of evidence. There were very few spectators in the audience during the trial. There were three (3) consistent

Investigation on    9/30/2002    at    Baltimore, Maryland

File #   52B-BA-102647-79

Date dictated    9/30/02

SSA
by    SA [          ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

I-279   b1.302

52B-BA-102647-79

*EXHIBIT "D"*

FD-302a (Rev. 10-6-95)

52B-BA-102647

Continuation of FD-302 of _____ , On 10/04/2002 , Page 2

b6
b7C

witnesses as they gave testimony and then taken back by the prosecutor.

It was his recollection that nobody else, not even the court reporter nor the courtroom clerk, ever touched money. None of the jurors nor any of the court staff exhibited any undue interest in the money when it was displayed, nor did they seem fixated on the money. _____ reminded the interviewing agents that the money was only shown for a very brief time, and even recalled that the judge ordered the prosecutors to put the money away as it blocked the witnesses' faces.

Asked if he was familiar with anyone who attended the trial and sat in the public gallery, _____ replied that he was only familiar with three people who regularly attended the trial: BROWN's mother, his wife _____ , and his sister. Though he did not face them while in court, he especially recalled them because the trial judge made numerous references to the three women, who always sat on the back row of the gallery. _____ also recalled that BROWN's father, _____ (FIRST NAME UNKNOWN) _____ attended the last day of the trial. _____ believed that _____ know where she currently resided. He believed that her previous address was _____ He did not know BROWN's sister's name, nor his mother's name. However, because he always contacted his client through his mother, he knew the mother's telephone number _____

He also recalled some additional spectators, mainly from the United States Attorney's Office, who attended various portions of the trial. The individuals he could recall were AUSAs _____ Public Defender _____ Courtroom Clerk _____ attorney _____ who was representing the government witness _____ and attorney _____ who represented _____ He also recalled that on at least two occasions there were other parties present, who he did not know, but had hearings before the judge between breaks in his trial. None of these individuals exhibited any interest in the money either and they did not enter into the well of the court.

Asked if he felt there was more interest in this case than in other bank robbery trials he had been involved in, _____ replied perhaps a little bit. He sited the religious aspects of the case _____ BROWN had said that he (BROWN)

*EXHIBIT "E"*

## ARTICLE IX   AUTHENTICATION AND IDENTIFICATION

Rule 901.    Authenticating or Identifying Evidence
Rule 902.    Evidence That Is Self-Authenticating
Rule 903.    Subscribing Witness's Testimony

Rule 901.    Authenticating or Identifying Evidence

(a) **In General.**   To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

(b) **Examples.**   The following are examples only–not a complete list–of evidence that satisfies the requirement:

(1) *Testimony of a Witness with Knowledge.* Testimony that an item is what it is claimed to be.

(2) *Nonexpert Opinion About Handwriting.* A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.

(3) *Comparison by an Expert Witness or the Trier of Fact.* A comparison with an authenticated specimen by an expert witness or the trier of fact.

(4) *Distinctive Characteristics and the Like.* The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

(5) *Opinion About a Voice.* An opinion identifying a person's voice–whether heard firsthand or through mechanical or electronic transmission or recording–based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

(6) *Evidence About a Telephone Conversation.* For a telephone conversation, evidence that a call was made to the number assigned at the time to:

(A) a particular person, if circumstances, including self-identification, show that the person answering was the one called; or

(B) a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone.

(7) *Evidence About Public Records.* Evidence that:

(A) a document was recorded or filed in a public office as authorized by law; or

(B) a purported public record or statement is from the office where items of this kind are kept.

USCSRULE                                    1

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

FD-302 (Rev. 10-6-95)

*EXHIBIT "F"*

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/01/2002

ALEXANDER HARVEY, II, United States District Court Judge, District of Maryland, U.S. Courthouse, 101 West Lombard Street, Baltimore, Maryland, 21201, telephone (410) 962-7831, was advised of the nature of this brief interview and the official identity of the below listed FBI Supervisory Special Agent (SSA). HARVEY was interviewed at his Judge's Office, concerning the theft of $36,750.00 in U.S. Currency, that had been presented in a trial in Courtroom 5B. HARVEY thereafter provided the following information:

HARVEY advised he was aware that the Federal Bank Robbery trial of subject NACOE RAY BROWN was occurring in the Courtroom 5B of U.S. District Court Judge ANDRE DAVIS. He stated that all Judges have a Wednesday "Judges Lunch", at which time cases and issues are discussed. Approximately three weeks ago Judge ANDRE DAVIS told the other Judges he had a bank robbery trial in which the defendant was charged with robbing four banks. HARVEY was interested in this case and discussed it with Judge DAVIS, because of the legal technicalities in charging a person with four bank robberies. 

HARVEY also attended the "Judges Lunch" last Wednesday, 9/25/02, and the NACOE RAY BROWN trial was again discussed. HARVEY advised that Judge DAVIS found it surprising that the case had gone to the jury, and he (DAVIS) was also surprised at the level and number of questions coming from the jury. Judge DAVIS did not understand why there were so many questions from the jury and advised HARVEY.

HARVEY was at work in his Courtroom and his office for the week of Monday, 9/23/02 until Friday, 9/27/02. HARVEY was not aware that any large amounts of U.S. Currency were being maintained in Courtroom 5B. HARVEY advised that many years ago he had small amounts of coins stolen from his desk drawer. He suspected the cleaning service and spoke to the cleaning service supervisor. After he spoke to the cleaning service supervisor about the matter, no more coins were taken from his desk drawer.

HARVEY became aware that a plastic package containing $36,750.00 in U.S. Currency was stolen from the U.S. Courthouse on

*See 1A-24*

| | | | b6 |
| --- | --- | --- | b7C |

Investigation on   10/01/2002   at   Baltimore, Maryland

File #   52B-BA-102647-31         Date dictated   10/01/02

by   SSA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

I/274    03.302             52B-BA-102647-31

To: Criminal Investigative, Director's Office From:   Baltimore
Re:  52B-BA-102647, 09/30/2002

**LEAD (s):**

**Set Lead 1:**

### CRIMINAL INVESTIGATIVE DIVISION

#### AT WASHINGTON, D.C

     FBIHQ, CID, Violent Crimes Major Offenders Section, Major Theft/ Transportation Crimes Unit, investigation summary is provided, read and clear.

**Set Lead 2:**

### DIRECTORS OFFICE

#### AT WASHINGTON, D.C

     FBIHQ, Director Office, Office of Professional Responsibility II, investigation summary is provided, read and clear.

DECLASSIFIED BY NSICG 53Q93B91
ON 08-24-2016

```
06/18/03                         SECRET                    ICMIPR01
08:06:05                         FD-192                     Page  1
```

**Title and Character of Case:**

CURRENCY THEFT OF THIRTY SIX THOUSAND SEVEN HUNDRED FIFTY DO
US DISTRICT CT

---

**Date Property Acquired:**      **Source from which Property Acquired:**
                                 COURT SECURITY OFFICE/U.S. COURTHOUSE
  06/16/2003                     101 W LOMBARD  ST

                                                                          b6
                                                                          b7C
**Anticipated Disposition:**  **Acquired By:**            **Case Agent:**

---

**Description of Property:**                              **Date Entered**
  1B 1

  COURT SECURIY OFFICER LOG IN SHEET(TIMESHEET ORIGINALS)AND
  SENIORITY LIST

  Barcode: E01975421    Location: ECR        CAB               06/18/2003

---

  Case Number:  52B-BA-102647 (S)        FILE
  Owning Office:  BALTIMORE               1B1
                                 SECRET



SECRET

| 08/06/07 09:27:58 | | Collected Items for a Case<br>Case ID: 52B-BA-102647 (S)<br>Collected Item Type: All<br>Category Type: 1B | | | | ICM1PRO5<br>PAGE    1 |

| Cat/Num Barcode | Office and Storage Location | | Type | Acquired/ Chrged Out | Charged Out To/ Reason | Contributor/ Description |
|---|---|---|---|---|---|---|
| (S) 1B1<br>EC1275421 | BA ECR | CAB | G | 06/16/2003 | | COURT SECURITY OFFICE/U.S. COURTHOUSE<br>COURT SECURITY OFFICER LOG IN SHEET(TIMESHEET ORIGINALS)AND<br>SENIORITY LIST |
| (S) 1B2<br>E03644065 | BA ECR | CAB | G | 12/19/2003<br>12/22/2003 EXAMINE | | 52B-BA-102647 -1A(89)<br>TWO(2) FINGERPRINT CARDS OF JONATHAN PAUL LUNA, DOB 10/21/1965 |
| (S) 1B3<br>E03644144<br>(U) | BA ECR | CAB | G | 03/29/2004 | | US POSTAL SER, REG MAIL #RB366054237US, FROM FBI/LAB<br>Q 10.1 THREE(3) PHOTOGRAPHS LAB #030623001 (RESUBMISSION OF<br>Q10 FROM LAB #020930001 ND - 91A-BA-100604-1B(4) INTERNAL<br>K-PAK) |



SECRET

(12/31/1995)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  IMMEDIATE                          Date:  09/30/2002

To:  Criminal Investigative        Attn: Major Theft/
                                          Transportation
                                          Crimes Unit (MT/TCU)
                                          UC
                                          SSA                                    b6
                                                                                 b7C

        Director's Office          Attn: Office Of Professional
                                          Responsibility (OPR),
                                          Internal Investigative
                                          Unit II
                                          Room 11861
                                          UC

From:  Baltimore
        Squad 15
        Contact:  SSA

Approved By:

Drafted By:

Case ID #:  52B-BA-102647

Title:  UNSUB (S);
        THEFT OF $36,750 US CURRENCY
        IN EVIDENCE AT THE US DISTRICT COURTHOUSE
        101 W. LOMBARD STREET
        BALTIMORE, MD.
        9/23/02 TO 9/26/2002;
        TGP
        OO:BA

*FAXED to (MT/TCU) & (OPR) ON 9/30/02 5:00pm*

## **THIS EC WAS NOT UP-LOADED**

Synopsis:  FBIHQ, MT/TCU and OPR are advised of an on-going
investigation in FBI Baltimore Division.

Administrative:  Reference telcal on 9/27/02 between FBI
Baltimore ASAC [          ] and FBIHQ, OPR UC [          ]
Telcal on 9/30/02 between FBI Baltimore SSA [          ] and
FBIHQ MT/TCU UC [          ]

Details:  On 9/9/02, the trial of U.S. vs Nacoe Ray Brown for
Bank Robbery began in U.S. District Court in Baltimore, Maryland
(File # 91A-BA-100604).  U.S. District Court Judge Andre Davis
presided over this trial in courtroom 5B and the jury returned a
guilty verdict on the afternoon of 9/26/2002.

        The evidence presented during this trial included

*Not uploaded per SSA [ ] 10/3/02 [ ]*        FILE ;    52B-BA-102647-50

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    10/01/2002

_____ a black female, date of birth _____  
_____ social security account number _____ was interviewed  
at her place of work, 101 West Lombard Street, Baltimore, MD 21201,  
_____ After being advised of the identity of the  
interviewing agent and the purpose of the interview, _____ gave the  
following information:

b6  
b7C

_____ has worked for _____  
for ___ years. She is currently _____  
_____  
_____ _____ has worked out of the U.S. Attorney's Office  
since _____ and has an office on the sixth floor.

_____ was aware that there was a new trial prep room on  
the sixth floor. She has never used the room and did not know the  
procedures to signing up for the room. However, _____ indicated  
that she really does not have a need for that room. _____ was not  
aware that there was a key to the room and does not possess a key  
to the room.

_____ has seen AUSA JONATHAN LUNA in the trial prep room  
with other people that she did not recognize. She was aware that  
LUNA was in middle of a trial and did not think anything of it.  
_____ is sensitive about office security and makes note of people  
who should not be there. Last week, she did not observe anything  
out of the ordinary. _____ noted that she was out of the office  
Monday and Thursday (9/23/02 & 9/26/02) for training purposes.

_____ advised that she did not take the money and did not  
have knowledge of the person who took the money. _____ indicated  
that she did not have financial difficulties and was not aware of  
anyone else at the office who was having money trouble. Lastly,  
_____ stated that she is willing to be polygraphed and emphasized  
that everything that she has told to the interviewing agent was  
truthful to the best of her knowledge.

Investigation on   09/30/2002   at   Baltimore, Maryland

File #   52B-BA-102647   Date dictated   n/a

by   SA _____    I:\Drafts\5 ____ \275 \02.302

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;  
it and its contents are not to be distributed outside your agency.

52B-BA-102647-89

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     10/03/2002

[                                                              ]     b6
currently working security for the United States Marshals Service,          b7C
was interviewed on 9/30/02 regarding the theft of money evidence in
the case of U.S. vs. NACOE BROWN.  After being advised of the
identity of the interviewing agent and the nature of the interview,
[        ] provided the following information:

    [        ] advised that he was assigned to Courtroom 5B
during the week of 9/23/02 - 9/26/02 for the above captioned case.
[        ] stated that he remembered seeing SA [              ] pulling the
evidence cart from the courtroom to the elevators, but he wasn't
sure what day it was.  [          ] noted that SA [        ] was "pulling"
the cart and not pushing it.  [        ] advised that he saw the money
in the box in the bottom of the cart and commented to SA [        ]
"That's alot of money".  [            ] stated that SA [          ] acknowledged
his comment and continued toward the elevators.  [            ] said that
the money was clearly visible in the box at the bottom of the cart.

276[    ] 02.302

Investigation on    9/30/02    at    Baltimore

File #   52B-BA-102647-91                          Date dictated   9/30/02

by    SA [                                        ]

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

52B-BA-102647-91

To:  Criminal Investigative, Director's Office From:  Baltimore
Re:  52B-BA-102647, 09/30/2002



$63,128.00 in U.S. Currency which was seized from the co-
defendant's apartment.  During the trial, this money was
maintained at the U.S. Attorney's Office in a locked trial-
preparation room overnight and was returned to FBI Baltimore ECU
over the weekends.  The trial-preparation room where the evidence
was maintained was located on the sixth floor of the U.S.
Attorney's Office.  AUSA Jonathan Luna, AUSA [          ]          b6
[          ] gave FBI Baltimore SA [          ] a key to this room for   b7C
the duration of the trial.  At the conclusion of the trial, when
SA [          ] returned the evidence to the FBI Baltimore Division
ECU on 9/26/02, one of the sealed packages of cash containing
$36,750.00 in U.S. Currency was discovered missing.

     FBI Baltimore immediately began an exhaustive and
thorough search of all possible locations at the FBI Baltimore
Division Office Space.  Since 9/27/02, FBI Baltimore has also
conducted approximately eighty-five (85) interviews of U.S.
Judges, Assistant U.S. Attorneys, Law Students, Clerks,
Secretaries, Deputy U.S. Marshals, Court Security Officers
(CSOs), and numerous other personnel at the U.S. Attorney's
Office, and U.S. Courtroom with negative results.  FBI Baltimore
believes that unknowns subject(s) knew there was a large amount
of money in the cardboard box, and then went into the box and
only took out the one package of money with the largest
denominations. The Package that was taken contained $36,750.00 in
U.S. Currency, in $20.00 bills, that were wrapped by bank straps.

     On 9/28/2002, two FBI Baltimore SAs personally
delivered the remaining cardboard box and all its contents to
FBIHQ, Laboratory Services Division, Latent Print Unit (LPU), so
that the contents can be examined to determine if any latent
fingerprints of value can be obtained.

     FBI Baltimore anticipates numerous additional
interviews will be conducted this week.  The U.S. Attorney's
Office has provided full cooperation in this matter.  On 9/30/02,
1st Assistant AUSA [          ] advised that he would be reporting
this matter to the U.S. Department of Justice (DOJ), and their
office of Inspector General.

     Investigation in Baltimore is continuing, and this is
an on-going matter.

◆◆

U.S. Department of Justice

United States Marshals Service

# FIELD REPORT

| TITLE OF REPORT | REPORT DATE | PERIOD COVERED | REPORT BY | |
|---|---|---|---|---|
| MISSING EVIDENCE | 27 SEPT 02 | | CSW | b6 b7C |
| | REPORTING DISTRICT | | *CONTROL DISTRICT   PAN | |
| | MARYLAND | | | |

| TYPE OF CASE | STATUS OF CASE IN REPORTING DISTRICT | OPEN ☐ | CLOSED ☐ | DATE OPENED | DATE CLOSED |
|---|---|---|---|---|---|

*IN WITSEC CASES, THE CONTROL DISTRICT IS THE DISTRICT PROVIDING CONTINUING ASSISTANCE. IN WARRANT CASES, THE CONTROL DISTRICT IS THE DISTRICT WHERE THE WARRANT IS ISSUED.

ON 27 SEPT 2002 AT 1100HRS, I MET WITH DUSA [ ] WHO ADVISED ME OF THE FOLLOWING:
FBI AGENT [ ] REPORTS THAT $40,000 IN US CURRENCY WAS MISSING FROM HIS EVIDENCE PACKAGE IN THE BANK ROBBERY CASE OF DEFENDANT NACO BROWN THAT WAS TRIED IN COURTROOM 5B. [ ] STATES THAT THIS MONEY WAS LEFT ON THE TRIAL CART WHICH AT TIMES WAS LEFT UNATTENDED IN THE COURTROOM AND IN THE US ATTORNEY'S OFFICE. [ ] ADVISED THAT THIS EVIDENCE WAS LEFT DURING BREAKS AND AT LUNCH. [ ] ALSO ADVISED THAT THE MONEY WOULD NOT HAVE BEEN GIVEN TO THE JURY OR STORED IN THE COURT ROOM CLOSET.

| APPROVED: | | DO NOT WRITE BELOW | | |
|---|---|---|---|---|
| CO... | DISTRIBUTION | RECEIVED: | ASSIGNED TO: | FILE |
| 1 | Dusm [ ] | NOTATIONS: | | |
| 1 | Insl. [ ] | | | |

COVER PAGE

FORM USM-210
(Rev. 3/10/80)



Nacoe Ray Brown
ERN 34730-037
FCI Victorville II
P.O. Box 3850
Adelanto, CA 92301

CV

LEGAL MAIL

LEGAL MAIL

RECEIVED
CLERK U.S. DISTRICT COURT

FEB - 6 2017

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

Clerk of the Court
Central District of California
312 N. Spring St.    Room  G-8
Los Angeles, CA  90012